# Mercer Central Agricultural Society v. Mercer County Commissioners

*Edwin C. Moon*, for plaintiff.

*Stranahan & Sampson, Leo H. McKay* and *LeRoy R. Rickard*, for defendants.

ROWLEY, P. J., August 6, 1945.—Complainant filed this bill in equity to restrain collection of taxes assessed against its lands.

The lands include 40 acres in Findley Township, hereinafter referred to as parcel "F", and 19 acres in

the Borough of Mercer, hereinafter referred to as parcel "M".

The appropriate taxing authorities have caused to be assessed, levied and filed against parcel "M" county, institutional, borough and school taxes for the year 1942. The School District of the Borough of Mercer also levied taxes upon parcel "M" for the years 1943, 1944, and 1945.

The appropriate authorities have caused to be assessed, levied, and filed against parcel "F" county, institutional, road and school taxes for the years 1932 to 1943, inclusive. The same authorities have assessed and levied taxes for the year 1944 which have not been filed. On February 16, 1939, the county commissioners by formal resolution exonerated taxes assessed upon complainant's land for the years 1932 to 1938, inclusive.

Complainant claims exemption from taxation because of the character of its business as operator of a county fair.

Defendants oppose the exemption, averring that complainant "is not an institution of learning, benevolence or charity and is not founded or endowed and has not been maintained and is not now maintained by either public or private charity".

The answers also aver that certain parts of the lands are used by complainant for commercial purposes and other uses unrelated to the purposes for which complainant was incorporated.

### Findings of fact

1. The Mercer Central Agricultural Society of Mercer County, Pennsylvania, Inc., was duly incorporated on December 15, 1883, by a decree of the Court of Common Pleas of said county under The Corporation Act of April 29, 1874, P. L. 73.

2. The purposes of said corporation are set forth in the charter as follows:

"The object of this society shall be to promote and foster Agriculture, Horticulture; the Domestic and Household Arts, the improvements of the breeds of horses, cattle and other stock and generally all such lawful incidents to the foregoing as may be prescribed in the by-laws."

3. The charter also contained the following:

"The capital stock of this society shall be five thousand dollars divided into one hundred shares and the par value of each share shall be fifty dollars."

4. Ever since its incorporation, complainant has annually conducted a county fair of several days duration.

5. Parcel "F" was first acquired by complainant. This contains a grandstand, exhibition halls, barns for exhibition of horses, cattle, sheep, hogs and chickens; also display buildings for handcraft, vegetables, etc.

6. Prior to its purchase by complainant, parcel "M" was rented by complainant and was adapted as a "tying" or "hitching" area to accommodate horses and vehicles of patrons of the fair. After acquisition of this parcel its use as a hitching ground was continued until some 12 years ago when automobiles generally supplanted horses.

7. There are no buildings or other structures on parcel "M". This parcel originally fronted a distance of 600 feet on North Pitt Street. This area has not been plotted nor subdivided but three or three and one-half lots, each with a frontage of 60 feet upon this street and a depth of 200 or 250 feet, have been sold by complainant.

Some eight or nine acres of parcel "M" have been leased gratis to the Borough of Mercer in pursuance of a plan to establish a park as a W. P. A. project. The fence was removed and some excavating done which renders this portion unsuited for any use in its present condition. Since 1932 a portion of parcel "M" was rented as a pasture for two years at an annual rent of $50.

8. At the annual fair, cash premiums are offered for the first and second of each group of numerous classes of horses, cattle, sheep, swine, poultry, etc. First and second cash prizes are awarded for grains and seeds, vegetables, fruits, flowers, dairy products, canned goods, home-baked goods, candy; also for grange displays, 4-H exhibits, victory gardens, hand-painted china, paintings, drawings, quilts and rugs, knitted work, embroidery, etc.

8½. Complainant maintains numerous suitable halls, livestock barns and other structures for the display and exhibition of the foregoing. No entry fee is charged to the exhibitor.

9. Vendors of farm machinery and equipment are permitted to exhibit on the fair grounds without charge.

10. Horse races are conducted for cash purses. Contestants pay small entry fees which aggregate approximately $200.

11. During the past 10 or 12 years the fair activities have been confined to parcel "F". During the fair certain spaces are leased to concessionaires who conduct thereon shows, exhibitions, merry-go-round, ferris wheel, games, etc. The total area so used approximates two acres. Throughout the area are numerous stands or booths for the sale of food and drinks.

All concessionaires either pay a fixed fee or share the proceeds with the fair association.

12. During the winter months, the Mercer Sanitarium and the Mercer County Home, owners of adjacent lands, store farm machinery in some of the buildings on parcel "F", gratis.

13. When the fair is not in progress, the race track is used for training horses. This use of the track aids in keeping the track in condition for fair use. No charge is made for such use.

14. Numerous groups, sheep breeders' association, calf clubs, boy scouts and others occasionally picnic on

parcel "F" for which use no charge is made by complainant.

15. The secretary of the complainant corporation receives an annual salary not in excess of $125. There are no other salaries.

16. In 1908 or 1909 the corporation paid a dividend to its shareholders. No other dividend has been paid.

17. The income of the association includes an annual appropriation of $700 by the County of Mercer, a Commonwealth appropriation of $300 to $1,000, and receipts from admissions and concessions indicated as follows:

| Year | Admissions | Concessions |
|------|-----------|-------------|
| 1944 | $1,250.25 | $1,029.14 |
| 1942 | 1,292.75 | 1,327.71 |
| 1941 | 5,238.40 | 1,557.42 |
| 1940 | 4,497.19 | 1,142.25 |
| 1939 | 3,500.00 | 1,706.17 |

18. The fair has been conducted at a loss since the year 1932. The association has an indebtedness of $10,000.

### Discussion

Defendants attack the claim for exemption on the general ground that a fair association is not endowed, founded or maintained by public or private charity, yet with commendable frankness defendants concede that the opinion of Judge Parker in York County Agricultural Society v. York County et al., 119 Pa. Superior Ct. 85, offers some support for complainant's contention.

We are constrained to adopt the following declaration of Judge Parker (p. 91):

". . . land, if not operated for profit and used *exclusively* for an educational purpose such as agricultural and horticultural exhibits and the exhibiting of horses, cattle, pigs, sheep and the like and *numerous other* activities usually found at a county fair, is then

entitled to exemption from taxation. . . ." (Italics supplied.)

But defendants argued that complainant is not exempt even under the rule above quoted because:

1. It was founded by a sale of stock;
2. Profits have been distributed to shareholders;
3. Parcel "M" is not "used at all for fair purposes nor any other purpose";
4. Part of parcel "F" is used for commercial purposes.

We shall briefly consider the objections in the above order.

I. Whether the issuing of shares of stock is inconsistent with "endowed, founded or maintained by public or private charity", depends upon the declared purposes of the corporation, its actual operations, and privileges of the shareholders.

Money or property given for the permanent use of an institution, person or object is nonetheless an endowment because a certificate evidencing the gift is issued to the contributor.

There is evidence of somewhat general confusion regarding corporations of the first class. The original Act of 1874 did not designate such corporations 'not for profit'. That distinction appeared in a pamphlet published by one of the sponsors of the statute. Curiously enough, when the original act was amended by the Act of April 17, 1876, P. L. 30, the amendment assumed that the original act contained such a designation.

It has been held that only a corporation "not for profit" may be formed by the court of common pleas: Solebury Mutual Protective Assn., 3 Pa. CC 637; Richmond Retail Coal Company of Philadelphia, 9 Pa. CC 172 (1890). But in Players' National League Base Ball Club of Philadelphia, 25 W. N. C. 187 (1889), it was said the legislature did not intend to take away from the stockholders of corporations that come within the first class the right to profits.

But see the Nonprofit Corporation Law of May 5, 1933, P. L. 289, sec. 304.

We believe, nevertheless, that the purposes set forth in the application for the instant charter disclosed a corporation organized not for profit. But, it may be asked, what of the issuing of shares of capital stock? At the argument some doubt was expressed as to the right of a first-class corporation to issue shares. We think the Act of 1874 impliedly granted such authority. The data specified by the statute to be set forth in the application for a charter of the first class include "The amount of capital stock, if any, and the number and par value of the shares into which it is divided."

Applications for charters of the second class were required to set forth the above, also "that ten percent of the capital stock thereof has been paid in cash."

"While the act does not require that the certificates of corporations of the first class having capital stock, shall set forth that any particular portion thereof has been paid in, the courts will not approve a charter where the amount contributed is not proportionate to the amount of capital needed for the transaction of the proposed business of the corporation": Eastman on Corporations, sec. 58, citing Hall Assn. 10 Dist. R. 621.

The shares issued in the instant case antedated the Act of June 25, 1895, P. L. 310, hence the later statute could not impose the tax liability therein recited upon shares issued in 1883.

In our opinion the mere issuing of shares did not deprive the corporation of any immunity enjoyed by a corporation not for profit.

The prescription in the statute seems to suggest that there be shares. It may well be that the incorporators regarded the issuing of shares as mandatory.

II. It must be conceded that the distribution of a dividend to its stockholders was inconsistent with the theory of a nonprofit organization.

But what penalty did it entail? Not the penalty prescribed by the Act of June 25, 1895, P. L. 310, because the action there provided for requires assent of a majority of the members of a corporation, whereas a board of directors is the dividend-declaring authority.

The evidence is that the fair has been conducted at a loss since 1932. We are not warranted in assuming that dividends were omitted during 50 years for lack of earnings. The action of a particular board of directors on a single occasion was ill-judged and may have invited forfeiture of the charter if directly attacked. However, the single act of the board did not constitute complainant a corporation for profit. It is some evidence as to the real character of the corporation, but we think it is clearly overborne by the activities of the association during a period of half a century.

III. The third complaint is that parcel "M" is not actually used for fair purposes or any other purpose.

It is undisputed that this parcel was used as a hitching ground by the corporation before it was purchased by the latter.

There was actual need for the parcel at that time. With the advent of the automobile, patronage of the small county fair was noticeably affected. Formerly, the usual patron drove a carriage or a farm wagon. Ordinarily, he arrived at the fair ground in the forenoon; usually the entire family accompanied him. It was necessary that there be an area where horses could be tied and left with assurance. Provision for picnicking was required for the very large number of patrons who were obliged to set out from home at an early morning hour in order to travel the distance over indifferent roads in slow moving vehicles.

But the automobile has made conveniently accessible to former fair patrons other attractions throughout the year. In consequence, avid interest in fairs was dissipated and attendance dwindled. Moreover, the motorist need not set out for the fair until after midday.

Automobiles are readily parked in a fraction of the space required for horses and vehicles. Feeding area for the horses and picnicking for the families are no longer fair problems.

We think it must be conceded that parcel "M" was originally acquired for fair purposes. Inasmuch as the original purpose is now obsolete, can it be said that it is no longer held for fair purposes?

Having been appropriately acquired and used, we would be loath to penalize the corporation because its patronage can be accommodated with more restricted facilities than it is prepared to supply. Especially so, where the particular land is not being devoted to a use inconsistent with corporate purposes.

It is altogether likely that the original tract "F" and its exhibition halls are now also more extensive than has been required by the attendance and the exhibits in recent years. That a marked reduction in the use of horses may have rendered unnecessary many exhibition barns and appurtenant land would not alter the character of the tenure of such property. We think the same may be said of the obsolete hitching area, parcel "M".

It would be unjust to permit a corporation to accumulate untaxed lands not necessary for corporate purposes. But a too stringent limitation might unreasonably hamper corporate activities. No one prescribes the dimensions of the lot upon which a church is erected, nor does anyone seek to limit the number of acres contained in the college campus.

Complainant has made no recent use of parcel "M". If it were being devoted to a noncorporate purpose for gain, we should have a different question. The character and extent of the use of parcel "M" relieves us of the necessity of discussing pasturing.

The sale of a portion of the land as building lots does not affect complainant's status. Such sale, together with the lease of part of the area to the borough for

park purposes, evidences complainant's intention to divest itself of land no longer used or needed for fair purposes. All that can be required is good faith on the part of complainant's officers and directors with respect to its acquisition and tenure of land. If the reasonable discretion vested in them is abused, that can be made the subject of an appropriate proceeding. We find nothing to impugn the good faith of complainant's managers, nor is there any evidence of abuse of its privileges and immunities.

IV. The final objection is that parcel "F" is used in part for commercial purposes.

In our opinion the gratis storing of farm equipment of adjoining landowners during a brief period when the buildings are not in use for fair purposes, is but an instance of "neighboring" characteristic of a rural community. The operations of a fair, which attracts a great multitude, may be assumed to impose to some extent upon adjacent landowners. Accommodation extended by the fair management to neighbors may excuse occasional trespasses by fair patrons.

But defendants complain that the area occupied by the merry-go-round, ferris wheel, and similar attractions is not used for corporate purposes. They urge that such attractions

"Must meet the additional tests of other charitable institutions to retain their statutory exemption, and the question now becomes, whether these concessions which keep fairs on their financial feet are incidental to fairs or whether they are incidental to agricultural and horticultural purposes."

It must be conceded that there is a possibility of a county fair degenerating into the street carnival type. Should it become apparent that the principal activities of a fair association are foreign to the field of agriculture and animal husbandry, then such an association would have no standing to claim exemption from taxation.

In the instant case it cannot be said that the association draws its principal revenue from concessions.

Receipts are available for only the years 1939 to 1944. These offer some basis for comparison. In the year 1942, admissions were $1,292.75 and concessions $1,327.71. But with $5,238.40 admissions in 1941, concessions were only $1,557.42. So in 1940, admissions were $4,497.19, and concessions $1,142.25.

Complainant's Exhibit No. 1 is a premium list for the 1944 fair. Therein prizes are offered for 10 classes of horses. Each of the first four classes includes nine groups. There are cash prizes for two of each group. In addition to these, 60 other cash prizes are awarded for horses exhibited.

Premiums offered for cattle include six classes. Each class comprehends 10 or more groups. Three cash prizes are offered to each group. There are first and second prizes for seven classes of sheep, each class comprehending six groups. Similar prizes are offered for swine and poultry, also for grains, vegetables and fruits. A prize of $100 is offered for a grange display. Numerous prizes are provided for dairy products, for canned fruit, canned meats, dried vegetables, dried fruits, preserves, jellies, jams, butters, baked foods, candy, flowers, plants, knitted work, embroidery, quilts, rugs, 4-H Club exhibits of beef, lamb and poultry, and many others.

Exhibits and displays provided for are closely allied to agriculture and they are educational in nature. In our opinion these constitute the principal and the distinctly preponderating factors of the annual fair. Indeed, defendants do not argue the contrary. But the point urged upon us by defendants is that the area occupied by the merry-go-round and like attractions cannot share the tax exemption accorded to land used in pursuance of a program for stimulating agriculture.

The announced corporate purpose of the instant agricultural society is to promote and foster agriculture.

Attainment of such purpose requires that the program be presented to the persons whom it is intended to influence. Therefore the undertaking is to assemble farm owners and agricultural workers at a given time and place, to wit, at the annual fair. To procure the largest possible attendance, the assembly must offer a pleasing and attractive environment. A fair which presented only a collection of farm animals and samples of crops would be a drab affair that would arouse little enthusiasm for the general subject of agriculture. The interchange of information and ideas by fair patrons accords well with the objectives sought. The experience is wholesome and it is helpful in their common problems. Attendance at the fair has ever been an adventure in merry-making. Not long ago the fair was the one principal outing for rural residents. Farm youths of yesterday would view a fair stripped of merry-go-round and fun-making much as a Christmas without Santa Claus.

It can be argued with sound reason that the merry-go-round and similar attractions do not bear upon agriculture. When Judge McDermott was on the bench in this district a bill for injunction was presented to restrain the school directors of Greenville from teaching music in the public schools.

Complainants there argued that the taxpayers were required to offer only a common school education and that music was not comprehended in a common school education. Judge McDermott refused the injunction, declaring that a common school curriculum included whatever a competent, honorable and conscientious board of school directors believed it should include.

Music and fun-making are not indispensable to agricultural exhibits, but they are proper incidents which add entertainment to the program and thereby render the whole more effective.

Defendants' brief suggests that a college may not operate a merry-go-round as an incident to its activi-

ties, nevertheless, colleges do expend huge hums for athletic stadiums which engage only a few students in an activity that is only remotely related to education.

The State has ample power to confine the activities of a corporation within reasonable limits, but there has been no marked disposition to rigorously limit the quantity of real estate which may be held by a nonprofit corporation engaged in a charitable activity.

From the foregoing findings of fact and discussion, we draw the following

### Conclusions of law

1. Mercer Central Agricultural Society of Mercer County, Pennsylvania, Inc., the complainant herein, is a corporation of the first class organized and operating as a nonprofit association.

2. Complainants' lands in Findley Township and in the Borough of Mercer are not operated for profit and are exclusively used for an educational purpose, to wit, for agricultural and horticultural exhibits and the exhibiting of horses, cattle, pigs, sheep and the like and numerous other activities usually found at a county fair.

3. Complainant's lands are exempt from taxation.

### Order

And now, August 6, 1945, this matter came on for hearing upon bill and answer, whereon, after due consideration, it is ordered, adjudged and decreed that the Commissioners of Mercer County, the county treasurer, the Borough of Mercer, the School District of the Borough of Mercer, the Supervisors of Findley Township, the School Directors of Findley Township, their officers and agents, each and everyone of them, be, and hereby they are restrained from assessing, levying and collecting taxes upon land of complainant.

And the treasurer of Mercer County is directed to strike from the records of his office all taxes heretofore filed against complainant's land.

*Exception*

And now, August 6, 1945, to the foregoing order of court counsel for defendants except and, eo die, a bill of exceptions is sealed for defendants.